**FRANK HEMINGWAY, Inc., v. SOUTHPORT MILLS, Limited.**

(Circuit Court of Appeals, Fifth Circuit.    February 7, 1922.)

No. 3742.

Sales ⬸53(2)—Whether correspondence created a contract of sale and purchase held a jury question.

Whether letters and telegrams exchanged between the parties, under the circumstances in which they were written and sent, created a contract for the sale and purchase of a commodity, *held* a question for the jury.

In Error to the District Court of the United States for the Eastern District of Louisiana; William B. Sheppard, Judge.

Action at law by Frank Hemingway, Incorporated, against the Southport Mills, Limited. Judgment for defendant, and plaintiff brings error. Reversed.

Henry P. Dart, Jr., of New Orleans, La., for plaintiff in error.
John D. Miller, of New Orleans, La., for defendant in error.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. This suit is brought by the plaintiff in error (plaintiff below) to recover damages for the failure of the defendant to deliver 100 tons of acidulated cocoanut soapstock, containing 95 per

---

cent. saponifiable matter, which plaintiff claims defendant had contracted to deliver at 11 cents per pound ex dock New York. The damages claimed are the difference between this price and the market price which is agreed to have been 16 cents per pound.

The defendant was a producer of acidulated cocoanut soapstock in Louisiana. On or about May 29, 1919, through one Laing, a broker of New York City, a negotiation was inaugurated between plaintiff and defendant whereby plaintiff sought to purchase 100 tons of cocoanut oil fatty acid, otherwise known as acidulated cocoanut soapstock, for 11 cents per pound ex dock New York, for June and July shipments at seller's option.

A contract was sent to Laing by plaintiff describing said product as "cocoanut oil fatty acid (recovered cocoanut oil)." Laing advised plaintiff that defendant would not sell its product under this description and tendered a contract signed by the defendant with the material described as "acidulated cocoanut soapstock." The plaintiff refused to accept this contract and returned it to Laing in its letter of June 3, 1919, introduced by the defendant. The defendant pleaded that this declination was not communicated to it; but no proof of this fact was offered.

On July 12, plaintiff telegraphed to the defendant at New Orleans:

"Is your product described as acidulated cocoanut oil 95 per cent. saponifiable the free fatty acids of cocoanut oil and what is the average percentage of free fatty acid. Please wire reply."

To which the defendant, on June 13th, answered:

"Answering telegram, we do not make cocoanut or other fatty acids, but we do make acidulated cocoanut soapstock, 95 per cent. saponifiable matter, and presume this what you speak of. We do not sell this on any free fatty acid basis, but same generally runs around 85 per cent."

The plaintiff replied to this telegram on June 14, by a letter which, while not referring to the contract refused by them, might be construed as giving reasons for their unwillingness to then accept a contract for a product described as "acidulated cocoanut soapstock." The defendant, acknowledging the same, said:

"We are in receipt of your letter of the 14th, and in reply will say that our acidulated cocoanut soapstock is simply the refuse after refining the oil, and put into a concentrated form, running about 98 per cent. saponifiable matter. We usually sell, however, on a basis of 95 per cent. There is no cotton seed oil or other mixture in our product. We shall be glad to hear from you from time to time when you are in the market for either cocoanut oil or acidulated cocoanut soapstock."

Replying to this letter, on June 24, 1919, plaintiff wrote to defendant asking for a sample of its acidulated cocoanut soapstock, stating they wanted it for testing purposes. On July 1st defendant replied, stating they were sending by parcel post the sample of said soapstock "of which we owe you 100 tons for July shipment." There was no negotiation or communication between the parties under which defendant could owe to plaintiff 100 tons of said soapstock for July shipment, except the contract signed by defendant on or about May 29, 1919, and returned to Laing on June 3d.

On July 9, 1919, plaintiff wired the defendant as follows:

"Your letter July first sample received and O. K. ship on our order hundred long tons acidulated cocoanut soapstock 95 per cent. saponifiable eleven cents pound ex dock New York in time to catch steamer sailing from New York twenty-fifth instant. Kindly wire confirmation at once."

The market price ex dock New York on May 29th and named in the contract then tendered was 11 cents per pound. By July 1st, and thereafter during this transaction, it was 16 cents per pound. A confirmatory reply of July 10th advises that the space on steamer sailing on 19th has been booked and asks marking instructions. On July 17th the defendant wired plaintiff that it had learned from its New York representative that no contract for sale and purchase of this soapstock at 11 cents per pound had ever been made; that the plaintiff had refused to accept the contract tendered.

The plaintiff concedes that it had no contract through the negotiations with Laing, but contends that the subsequent correspondence, especially the letters and telegrams of July 1st, 9th, 10th, 11th, and 14th, constituted an offer of said 100 tons of soapstock by the defendant and its acceptance by plaintiff at 11 cents per pound. The court on the conclusion of the testimony, which included all of said letters, directed a verdict in favor of the defendant, and judgment was entered thereon accordingly.

The plaintiff contends that this was error, and that the case was one which should have been submitted to the jury. This is the single question in the case. If the jury, under any proper view of the evidence introduced, could have found for the plaintiff, the judgment should be reversed. If not, it should be affirmed.

We are of the opinion that there was not that absence of evidence in favor of the plaintiff which authorized the court to direct a verdict in favor of the defendant. It is not enough that the evidence preponderates in favor of one of the parties, and that the court would grant a new trial on the ground that the verdict was against the weight of evidence. A verdict should not be directed if—

"the conclusion did not follow, as matter of law, that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish." Dunlap v. Northeastern Railroad Co., 130 U. S. 649, 652, 9 Sup. Ct. 647, 648 (32 L. Ed. 1058); Gardner v. Michigan Central Railroad Co., 150 U. S. 349, 361, 14 Sup. Ct. 140, 37 L. Ed. 1107.

From the evidence in this case it did not appear as matter of law that no contract had been made between the parties. The defendant offered in evidence plaintiff's letter to the broker, Laing, that it declined the defendant's contract. No testimony was offered which showed that the defendant was not notified of this declination. The only statement to this effect was in certain letters of the defendant which were not proof of this fact.

The letter of the plaintiff of June 14th is susceptible of meaning that plaintiff had made no contract, because they were not satisfied that acidulated cocoanut soapstock was the equivalent of cocoanut oil fatty acids. The letter, after saying they wished to be sure that they were equivalents, reads:

"We gather from your telegram that it is. Not knowing the term 'acidulated cocoanut oil.' we feared that it might mean cocoanut oil which had been acidulated by the addition of any percentage of a saponifiable acid, which, of course, according to the description, need not necessarily be cocoanut oil acid. Further, not knowing the term, we did not see how the product could be described as an oil, if in fact it was a fatty acid. Our only object in telegraphing to you was to clarify the situation, so that in future we may have the pleasure of doing business with you, direct or through your brokers, knowing exactly what we are purchasing. We trust, therefore, that you will be so good as to write us comprehensively on this subject, so that we may be sure that the product you offer as acidulated cocoanut oil is, in fact, split cocoanut soapstock, containing whatever percentage of saponifiable matter you state, and, particularly, that the only saponifiable matter in the product is either cocoanut oil as such or cocoanut oil fatty acids. You may better understand our confusion if we give as an example a product containing, say, 5 per cent. of cocoanut oil and 90 per cent. to 95 per cent. of cotton seed fatty acids. By a stretch of the imagination this product could be described as acidulated cocoanut oil, there being cocoanut oil present which had been acidulated by the addition of a very large percentage of saponifiable acid matter. Awaiting the favor of your reply, we are."

It is to this that defendant's letter of June 20th replies, stating that its product is the refuse after refining the oil and put into a concentrated form running about 98 per cent. saponifiable matter, which they usually sell on a basis of 95 per cent., concluding:

"There is no cotton seed oil or other mixture in our product. We shall be glad to hear from you from time to time, when you are in the market for either cocoanut oil or acidulated cocoanut soapstock."

These letters furnish some evidence from which a jury might conclude that the Southport Mills did not consider themselves bound on June 20th by any contract to sell any acidulated cocoanut soapstock to the plaintiff. If, therefore, the defendant, in answer to the request for a sample for testing purposes wrote advising the shipment of "sample of our acidulated cocoanut soapstock, of which we owe you 100 tons, July shipment," with knowledge that the contract of May 29th had been rejected on June 3d, it would be a statement that, in view of the correspondence had since between the parties, defendant elected to treat the contract as continuing, and to advise plaintiff that it would still recognize the same. Plaintiff's telegram of July 9th and defendant's answer would conclude an agreement between them. If, on the other hand, the defendant, in ignorance of plaintiff's rejection of the contract of May 29th, and in the belief that it was a binding obligation, wrote the letter of July 1st, we do not think this letter and the telegrams alone would constitute a binding contract.

The letter does not offer to sell; it contains no terms of sale, but plainly refers to a previous negotiation. The telegram of July 9th in reply does not offer to buy, but refers to the sample as all right, and directs a shipment "on our order" at "11 cents per pound," when it is admitted the market price had for some time been, and then was, 16 cents per pound. The reply does not accept the terms mentioned. It treats them as already accepted, and notifies only that the selling space for shipment has been booked.

We think that the court erred in directing a verdict for the defendant, but should have submitted the case to the jury under proper instructions.

The judgment of the court below is reversed, with directions to grant a new trial.